# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**
*ex rel.* **[UNDER SEAL]**

      **Plaintiffs,**

**v.**

**[UNDER SEAL]**

    **Defendants.**

_____/

**CIVIL CASE NO.: 20-cv-10784**

**HON: SEAN F. COX**
**MAG: DAVID R. GRAND**

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(b)(2) and**
**MCL § 400.610a(2)**

**DO NOT ENTER ON PACER**

**DO NOT PLACE IN PRESS BOX**

---

## FILED UNDER SEAL

---

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **KATHI RUBLES.** | **CIVIL CASE NO.: 20-cv-10784** |
| **Plaintiffs,** | **HON: SEAN F. COX** <br> **MAG: DAVID R. GRAND** |
| **v.** | **FILED UNDER SEAL** <br> **PURSUANT TO** <br> **31 U.S.C. § 3730(b)(2) and** <br> **MCL § 400.610a(2)** |
| **IN HIM PHARMACEUTICAL SERVICES INC., d/b/a A-V PHARMACY and A-V PHARMACY 11,  NWAMMIRI OKORAFOR, EMILIA OKORAFOR, MEARREY INC, d/b/a VICTORIA PHARMACY, and MARJORIE ARREY** | **DO NOT ENTER ON PACER** |
| **Defendants.** | **DO NOT PLACE IN PRESS BOX** |

_____/

## FALSE CLAIMS ACT COMPLAINT
## DEMAND FOR JURY TRIAL

### INTRODUCTION

1.     Relator Kathi Rubles ("Rubles" or "Relator") brings this action on behalf of the United States against Defendants In Him Pharmaceutical Services Inc., d/b/a A-V Pharmacy and A-V Pharmacy 11, Nwammiri Okorafor, Emilia Okorafor, Mearrey Inc, d/b/a Victoria Pharmacy, and Marjorie Arrey

(collectively referred to as "Defendants") for treble damages and civil penalties arising from the Defendant's false statements and false claims in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*, and on behalf of the State of Michigan for violations of the Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq*, by Defendants. Relator seeks to recover monies that Defendants caused the Medicare, Medicaid, and CHAMPVA/TRICARE programs to pay for controlled substances that were not used for a medically accepted indication and lacked a legitimate medical purpose in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*.

2.      Opioid abuse has brought about a national public health emergency. The dispensing and distribution of controlled substances, including prescription opioid painkillers, without a legitimate medical purpose and outside the usual course of professional practice exacerbate this crisis. Michigan individuals and families are impacted by this epidemic, as well as the Medicare program when its funds are used to pay for improperly dispensed controlled substances.

3.      By repeatedly dispensing opioids and other controlled substances prone to abuse without a legitimate medical purpose and outside the usual course of professional medical practice, Defendants have unlawfully profited from the opioid epidemic.

## JURISDICTION AND VENUE

4.     This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq* and the Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq*. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a)-3732(c) and 3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over this case pursuant to 28 U.S.C. § 1367.

5.     At all times material to this Complaint, Defendants regularly conducted business within the State of Michigan, and maintained permanent employees and offices in Michigan. Defendants are, therefore, subject to personal jurisdiction in Michigan.

6.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the Defendants transact business within, and the acts of Defendants alleged in this Complaint occurred within this District.

## PARTIES

7.     Relator Kathi Rubles is a citizen of the United States over the age of eighteen and a resident of the State of Michigan.

8.     Relator is the original source of the information underlying this Complaint provided to the United States and the State of Michigan. Relator has direct and independent knowledge of the information on which the allegations

are based and has voluntarily provided the information to the United States and the State of Michigan as required by the False Claims Act, 31 U.S.C. § 3730(b)(2) and M.C.L.A. 400.610(a). Relator does not believe any of the information underlying the allegations and transactions in this Complaint have been publicly disclosed. Relator is a family medicine specialist in Southfield, Michigan with more than 43 years of experience. She also specializes in anesthesiology. Relator graduated from Meharry Medical College in 1977. Currently, Relator has her own practice that focuses on home health involving mostly elderly patients.

9. Defendant In Him Pharmaceuticals Services Inc., d/b/a A-V Pharmacy and A-V Pharmacy 11, is a domestic corporation incorporated under the laws of Michigan headquartered at 35400 E Michigan Ave, Wayne, MI 48184. It operates as a retail pharmacy with locations at 35400 E Michigan Ave, Wayne, MI 48184 (the A-V Pharmacy location) and 13535 Puritan St, Detroit, MI 48227 (the A-V Pharmacy 11 location).

10. Defendant Nwammiri Okorafor is the registered agent, president, and treasurer of A-V Pharmacy and A-V Pharmacy 11, and resides at 1853 Midchester Drive West Bloomfield, MI 48324.

11. Defendant Emilia Okorafor is the director and secretary of A-V Pharmacy and A-V Pharmacy 11, and resides at 1853 Midchester Drive West Bloomfield, MI 48324.

12.     Defendant Mearrey Inc, d/b/a Victoria Pharmacy, is a domestic corporation incorporated under the laws of Michigan. It operates as a retail pharmacy with its principal place of business at 29963 Northwestern Hwy, Southfield, MI 48034.

13.     Defendant Marjorie Arrey is the registered agent of Victoria Pharmacy, and resides at 20001 Livernois Ave STE 100, Detroit, MI 48221.

## FACTUAL ALLEGATIONS

### I. The Opioid Epidemic

14.     On October 26, 2017, the HHS Secretary declared the opioid epidemic a national public health emergency under federal law. Statistics show the immense human and financial toll the opioid crisis has inflicted on the country. Nearly 350,000 Americans died from an opioid-related drug overdose between 1999 and 2016. 11.5 million Americans abused prescription opioids in 2016 alone, and 116 Americans died daily from opioid-related overdoses in 2016. From July 2016 to September 2017, emergency room visits for opioid-related overdoses increased by nearly 30%.

15.     Michigan is not exempt from the effects of the opioid epidemic. In 2017, retail opioid prescriptions in Michigan were dispensed at a rate of 74.2 prescriptions per 100 persons[1], well above the national average of 58.7.[2]

## II.     The False Claims Act

16.     The FCA provides, in pertinent part, that a person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1)(A)-(B) (2010).

17.     The FCA further provides:

the terms knowing and knowingly-
a)     mean that a person, with respect to information-
    (i)     has actual knowledge of the information;
    (ii)     acts in deliberate ignorance of the truth or falsity of the information; or
    (iii)     acts in reckless disregard of the truth or falsity of the information; and

---

[1] U.S. Ctrs. for Disease Control & Prevention, *U.S. State Prescribing Rates, 2017,* https://www.cdc.gov/drugoverdose/maps/rxstate2017.html (last visited July 11, 2019).

[2] U.S. Ctrs. for Disease Control & Prevention, *U.S. Opioid Prescribing Rate Maps,* https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited July 11, 2019).

b)      require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

## III.      The Medicare & Medicaid Programs

### A. Medicare

18.      Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. See 42 U.S.C. §§ 426, 426a.

19.      The Medicare Program consists of four parts: A, B, C, and D. Defendants submitted, or caused to be submitted, claims under Medicare Part D.

20.      In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. An individual is eligible to enroll in Part D if the individual lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B. 42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

21.      Part D coverage is not provided within the traditional Medicare program; it is based on a private market model. Medicare contracts with private entities known as Part D Plan "Sponsors" to administer prescription drug plans. Part D benefits are delivered by a Part D Plan Sponsor, which is either a

prescription drug plan, a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan (MA-PD plan), a Program of All-inclusive Care for the Elderly (PACE) organization offering a PACE plan including qualified prescription drug coverage, or a cost plan offering qualified prescription drug coverage. 42 C.F.R. § 423.4.

22.     When a pharmacy dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D plan and receives reimbursement from the Part D Plan Sponsor for the costs not paid by the beneficiary. Then the Part D Plan Sponsor notifies CMS that a drug has been purchased and dispensed through a Prescription Drug Event ("PDE") record, a document which includes data elements about the drug dispensed, the prescription, and the payment to the pharmacy. The PDE serves as the request for payment for each individual prescription submitted to the Medicare Part D Program.

23.     Further, CMS uses the information in the PDE at the end of the payment year to reconcile its advance payments to the sponsor with actual costs the plan sponsor incurred. *See* "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)" (April 27, 2006).

24.     Throughout the year, CMS makes prospective payments to Part D Plan Sponsors for three subsidies based on the Sponsors' approved bids: (1) the direct

subsidy designed to cover the Sponsor's cost of providing the benefits; (2) the low-income cost-sharing subsidy; and (3) the reinsurance subsidy.

25.     With a direct subsidy, CMS pays Part D Plan Sponsor advance monthly payments equal to the Part D Plan's standardized bid, risk adjusted for health status as provided in 42 C.F.R. § 423.329(b), minus a monthly beneficiary premium as determined in 42 C.F.R. § 423.315(b).  CMS also makes payments to the Part D Plan Sponsor for premium and cost sharing subsidies on behalf of certain subsidy-eligible individuals as provided in 42 C.F.R. § 423.780 and 42 C.F.R. § 423.782.

26.     During reconciliation, Part D sponsors who failed to submit required claims-level information contained in the PDE to CMS risk having to return the monthly payments. *See* 42 C.F.R. §§ 423.343(b), (c)(2) and (d)(2). Part D Sponsors are also responsible for correcting inaccurate on submitted PDEs. At year's end, CMS reconciles the prospective payments to the Part D Sponsor's actual allowable costs by relying upon data elements submitted by Sponsors in their PDE records.

27.     Part D Plan Sponsors, their authorized agents, employees, and contractors are required to comply with all applicable federal laws, regulations, as well as CMS instructions to receive Part D funds.

28.    All contracts between a Part D Plan Sponsor and HHS must include a provision in which the Plan Sponsor agrees to comply with the applicable requirements and standards of the Part D program as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112. Additionally, Part D Plan Sponsors must certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse. 42 C.F.R. § 505(h)(1).

29.    CMS regulations require all subcontracts between Part D Plan Sponsors and downstream entities to contain provisions that obligate the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv).

30.    Part D Plan Sponsors are required by federal regulation to certify to the accuracy, completeness and truthfulness of all data related to the payment. 42 C.F.R. § 423.505(k)(1) & (3). This certification further provides: "[i]f the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(3).

31.     Compliance with the requirement that PDE data submitted by the Plan Sponsor is "true, accurate, and complete," based on best knowledge, information and belief, is a condition of payment to the Plan Sponsor under the Medicare Part D Program. *Id*. Compliance is material to payment as well.

32.     Medicare only covers drugs that are used for a medically accepted indication, meaning a use that is approved under the Food, Drug, and Cosmetic Act, or a use which is supported by one or more citations included or approved for inclusion in one of the specified compendia. 42 U.S.C. § 1395w-102(e)(1) & (e)(4); 42 U.S.C. § 1396r-8(g)(1)(B)(i) & (k)(6); 42 C.F.R. § 423.100. PDEs lacking a medically accepted indication do not contain accurate, complete and truthful information about all data related to payment.

33.     Medicare only covers drugs that are dispensed upon a prescription. 42 U.S.C. § 1395w-102(e); 42 C.F.R. § 423.100. A "Part D sponsor may only provide benefits for Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription." 42 C.F.R. § 423.104(h). Valid prescriptions must comply "with all applicable State law requirements constituting a valid prescription." 42 C.F.R. § 423.100.

34.     If the prescribed drugs are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve functioning of a malformed body part, Part D plans may exclude them. 42 U.S.C. § 1395w-

102(e)(3).  Prescriptions  for  controlled  substances  that  are  not  issued  for  a  legitimate medical purpose are not for "medically accepted indications" and are  therefore  not  covered  Medicare  Part  D  drugs.    32  U.S.C.  §  1395w(e)(1).  Recreational use is not a legitimate medical purpose.

35.    Prescriptions  for  controlled  substances  that  are  not  issued  for  a  legitimate  medical  purpose,  such  as  recreational  use,  are  not  "valid  prescriptions," and are therefore not covered Medicare Part D drugs.  42 U.S.C.  § 423.104(h).

36.    PDEs  submitted  to  Medicare  for  controlled  substances  that  are  dispensed  when  not  issued  for  a  legitimate  medical  purpose  by  an  individual  practitioner acting in the usual course of his or her professional practice do not  contain  accurate,  complete  and  truthful  information  about  all  data  related  to  payment.

37.    Compliance with federal and state requirements relating to pharmacies'  dispensing of controlled substances is material to Medicare's decision to pay the  Defendants' claims for reimbursement of controlled substances.

38.    A  reasonable  person  would  know  that  Medicare  would  deny  Part  D  claims  submitted  to  Medicare  if  it  knew  that  the  controlled  substance  prescriptions at issue were invalid and lacked a legitimate medical purpose for a  medically accepted indication.

39.     CMS also has dual-eligible beneficiaries who receive both Medicare and Medicaid benefits. The two programs cover many of the same services, but Medicare pays first for the Medicare-covered services that are also covered by Medicaid.

40.     Under a dual-beneficiary status, Medicaid may pay for some cost-sharing amounts owed under Medicare, such as deductibles and copayments.[3]

41.     In addition to dual-status beneficiaries, Medicaid also pays certain copayments for beneficiaries with plans under a Managed Care Organization (MCO), which is a health care provider or group of providers who offer managed care health plans.

42.     A reasonable person would know that Medicare and Medicaid would deny dual-beneficiary and/or MCO claims submitted to those programs if it knew that the controlled substance prescriptions at issue were invalid and lacked a legitimate medical purpose for a medically accepted indication.

43.     Upon information and belief, Defendants likely submitted claims for reimbursement to Medicare, as well as dual-beneficiary and/or MCO claims, that contain false claims and statements.

**B.     Medicaid**

---

[3] CMS Guidance: Reporting Expectations for Dual-Eligible Beneficiaries, Updated; Medicaid.gov, https://www.medicaid.gov/medicaid/data-and-systems/macbis/tmsis/tmsis-blog/?entry=51064.

44.     When the Federal Government covers items or services rendered to Medicare and Medicaid beneficiaries, the False Claims Act applies.

45.     Michigan Medicaid regulations consider billing Medicaid for medically unnecessary services or prescription drugs fraud.[4]

46.     Compliance with federal and state requirements relating to pharmacies' dispensing of controlled substances is material to Medicaid's decision to pay the Defendants' claims for reimbursement of controlled substance.

47.     A reasonable person would know that Medicaid would deny claims submitted to Medicaid if it knew that the controlled substance prescriptions at issue were invalid and lacked a legitimate medical purpose for a medically accepted indication.

48.     Upon information and belief, Defendants likely submitted claims for reimbursement to Medicaid that contain false claims and statements.

C.     **CHAMPVA/TRICARE**

49.     TRICARE is a health care program for active and retired military personnel and their dependents, survivors and certain former spouses. The Federal Government pays the cost of TRICARE coverage.

---

[4] Medicaid Provider Manual, Section 16.2, Michigan Department of Health and Human Services. https://www.mdch.state.mi.us/dch-medicaid/manuals/MedicaidProviderManual.pdf.

50.    TRICARE only covers certain services and prescription drugs that are medically necessary and considered proven.[5]

51.    The Civilian Health and Medical Program of the Department of Veteran Affairs ("CHAMPVA") is a comprehensive health care program in which the VA shares the cost of covered health care services and supplies with eligible beneficiaries.

52.    CHAMPVA covers drugs and medications when the drug is medically necessary and appropriate for treatment of the patient's condition, and when the drug is prescribed and dispensed in accordance with state law and licensing requirements by an authorized prescriber.[67]

53.    When the Federal Government covers items or services rendered to CHAMPVA or TRICARE beneficiaries, the False Claims Act.

54.    Compliance with federal and state requirements relating to pharmacies' dispensing of controlled substances is material to CHAMPVA'S and TRICARE's decision to pay the Defendants' claims for reimbursement of controlled substance.

---

[5] https://www.tricare.mil/CoveredServices/IsItCovered/Prescriptions
[6] Fact Sheet 01-24 Pharmacy Benefits, Department of Veterans Affairs Health Administration Center, page 1. https://m.vfwilserviceoffice.com/upload/CHAMPVA%20Fact%20Sheet%2001-24%20Pharmacy.pdf.
[7] CHAMPVA Guide, U.S. Department of Veterans Affairs, page 18. https://www.va.gov/COMMUNITYCARE/docs/pubfiles/programguides/champva_guide.pdf.

55.    A reasonable person would know that CHAMPVA and TRICARE would deny claims submitted to CHAMPVA/TRICARE if it knew that the controlled substance prescriptions at issue were invalid and lacked a legitimate medical purpose for a medically accepted indication.

56.    Upon information and belief, Defendants likely submitted claims for reimbursement to CHAMPVA and TRICARE that contain false claims and statements.

### IV.    Defendants' Unlawful Conduct

57.    Relator is a primary care physician living in the Detroit metro area. She is self-employed and sees mostly home bound, older patients, and a decent portion of her work involves pain management.

58.    Every few months, Relator receives a report from the Michigan Automated Prescription System ("MAPS"). MAPS is Michigan's prescription monitoring program, and it is used to track controlled substances, schedules 2-5 drugs. It is a tool used by prescribers and dispensers to assess patient risk and is also used to prevent drug abuse and diversion at the prescriber, pharmacy, and patient levels.[8]

---

[8]https://www.michigan.gov/lara/0,4601,7-154-89334_72600_72603_55478---,00.html.

59.    The reports that MAPS send Relator is a snapshot of her prescribing habits.

60.    On May 23, 2019, MAPS sent Relator a report describing her prescribing habits from October 2018-March 2019, along with a guide for how to interpret the report. (RUBLES000006); (RUBLES000008-000014). The report stated that Relator had prescribed opioids to an average of 10 people per month over this period, and written an average of 12 opioid prescriptions per month. (RUBLES000007).

61.    Furthermore, the report showed that Relator had prescribed a monthly average of 15,225 morphine milligram equivalents (mme) of oxycodone. This was almost three times the industry average monthly oxycodone prescription volume for other Michigan physicians within Relator's specialty, which was 6104 mme. (RUBLES000007).

62.    Relator knew the statistics in the report were incorrect because she rarely prescribes opioids, and she never prescribes oxycodone. Part of Relator's practice focuses on pain management, and she sometimes prescribes hydrocodone and Xanax. However, the oxycodone prescriptions in her name were fraudulent.

63.    Relator emailed MAPS back the same day she received the report asking them to make the necessary corrections and send her copies of all of the oxycodone prescriptions. (RUBLES000004).

64.    MAPS responded by saying that it does not enter the information in the system; it only maintains the system and its data after it is reported by the dispensing pharmacy, and it does not have the authority to correct faulty data. It did confirm that all prescription data attributed to Relator had been reported to MAPS by the dispensing pharmacies. (RUBLES000001-000004).

65.    MAPS recommended that Relator do periodic checks to ensure prescriptions attributed to her DEA registration numbers are authentic prescriptions and properly attributed to her DEA number. (RUBLES000004).

66.    MAPS additionally recommended that Relator contact the filling pharmacy for any prescriptions that could not be reconciled with her patient charts and work to resolve the issue. In the alternative, MAPS suggested Relator contact law enforcement if she suspected the prescriptions were fraudulent. (RUBLES000004).

67.    MAPS gave Relator instructions that would allow her to view all controlled substance prescriptions attributed to her DEA number.

68.    Relator followed these instructions, and the search results revealed that all of the oxycodone prescriptions attributed to her were dispensed by the Defendants' pharmacies. (RUBLES000016-000031).

69.    The prescription list contained several hundred oxycodone prescriptions filled by Defendants from July 3, 2017 to June 10, 2019 that were

falsely attributed to Relator's DEA number. (RUBLES000016-000031). Based on the data in the prescription list, many of the patients were likely covered by Medicare, Medicaid, and/or CHAMPVA/TRICARE. Further, Defendants could likely be fraudulently filling invalid prescriptions in other providers names and billing Medicare, Medicaid, and/or CHAMPVA/TRICARE.

70.   On or about June 8, 2019, Relator filed a police report about the fraudulent prescriptions with the Wayne Police Department. (RUBLES000015).

71.   Upon information and belief, Defendants obtained Relator's name and registered DEA number and engaged in a pattern and practice of fraudulently filling oxycodone prescriptions under Relator's name that were not medically reasonable or necessary and had no legitimate medical purpose. Relator did not write these prescriptions, and they were falsely attributed to her. This practice is ongoing and has been occurring since at least July 2017.

72.   Upon information and belief, many of these fraudulent oxycodone prescriptions that Defendants filled were likely submitted to Medicare Part D, Medicaid, and CHAMPVA/TRICARE for reimbursement.

73.   Upon information and belief, Defendants have not paid back any of the fraudulent reimbursements it has obtained from Medicare, Medicaid, and CHAMPVA/TRICARE for the oxycodone prescriptions filled under Relator's name.

74.     Defendants' actions have caused at least hundreds of false claims for reimbursement to be submitted. Upon information and belief, Defendants have falsely certified that numerous Medicare, Medicaid, and CHAMPVA/TRICARE claims were for prescriptions written by Relator and have knowingly submitted numerous false claims to Medicare, Medicaid, and CHAMPVA/TRICARE for reimbursement of the oxycodone prescriptions filled under Relator's name. Each one of these fraudulent claims to Medicare, Medicaid, and CHAMPVA/TRICARE was a violation of the False Claims Act.

75.     Had the Government known that Defendants were fraudulently filling oxycodone prescriptions under Relator's name, it would not have reimbursed these services. To do so would put the Government in the position of funding fraudulent pharmaceutical and medical billing practices.

## COUNT ONE

### FEDERAL FALSE CLAIMS ACT: (PRESENTATION OF FALSE CLAIMS (31 U.S.C. § 3729(a)(1)(A))

76.     Relator re-alleges and incorporates the allegations in paragraphs 1-57 as if fully set forth herein.

77.     As set forth above, Defendants knowingly presented or caused to be presented or used false statements, certifications and records in order to get false or fraudulent claims paid or approved by the Government. The Government, unaware of the falsity of the statements, certifications, and records and claims made

21

thereupon, was damaged in a yet undetermined amount by the aforementioned misrepresentations and the Defendant's failures to comply with requisite agreements and regulations.

78.     Defendants' course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(l)(A); 3729(a)(l)(B); 3729(a)(1)(C); & 3729(a)(l)(G).

## **PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT**

***WHEREFORE***, Relator respectfully requests that this Court enter judgment against Defendants, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 et seq. provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented to the United States before November 3, 2015; that civil penalties of $21,562.80 be imposed for each and every false claim that Defendants presented to the United States between August 2, 2016 and February 3, 2017; that civil penalties of $21,916 be imposed for each and every false claim that Defendants presented to the United States between February 4, 2017 and January 29, 2018; that civil penalties of $22,363 be imposed for each and every false claim that Defendants presented to the United States after January 29, 2018 as adjusted by

the Civil Monetary Penalties Inflation Adjustment, 28 C.F.R. § 85.5, and all future amendments thereto.

(c)     That pre - and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e)     That the Relator be awarded the maximum percentage of any recovery allowed to her pursuant the False Claims Act, 31 U.S.C. § 3730(d)(1),(2); and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT TWO

### FEDERAL FALSE CLAIMS ACT: MAKING OR USING A FALSE RECORD OR STATEMENT TO CAUSE CLAIMS TO BE MADE (31 U.S.C. § 3729(a)(1)(B))

79.     Relator re-alleges paragraphs 1-57 of the Complaint as if set forth fully herein.

80.     Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims.

81.     By virtue of the false or fraudulent claims knowingly made or caused to be made by the Defendants, the United States suffered damages and therefore is

entitled to statutory damages under the False Claims Act, to be determined by a jury plus a civil penalty for each violation.

82.    Defendants' course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(l)(A); 3729(a)(l)(B); & 3729(a)(1)(G).

## **PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT**

***WHEREFORE***, Relator respectfully requests that this Court enter judgment against Defendants, as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 et seq. provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented to the United States before November 3, 2015; that civil penalties of $21,562.80 be imposed for each and every false claim that Defendants presented to the United States between August 2, 2016 and February 3, 2017; that civil penalties of $21,916 be imposed for each and every false claim that Defendants presented to the United States between February 4, 2017 and January 29, 2018; that civil penalties of $22,363 be imposed for each and every false claim that Defendants presented to the United States after January 29, 2018 as adjusted by

the Civil Monetary Penalties Inflation Adjustment, 28 C.F.R. § 85.5, and all future amendments thereto.

(c)    That pre - and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)    That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e)    That the Relator be awarded the maximum percentage of any recovery allowed to her pursuant the False Claims Act, 31 U.S.C. § 3730(d)(1),(2); and

(f)    That this Court award such other and further relief as it deems proper.

## COUNT THREE

## FEDERAL FALSE CLAIMS ACT: RETAINING OVERPAYMENTS
(31 U.S.C. § 3729(a)(1)(G))

83.    Relator re-alleges paragraphs 1-57 of the Complaint as if set forth fully herein.

84.    Defendants knowingly made or used false or fraudulent statements, or caused false or fraudulent statements to be made or used, for the purpose of

obtaining and retaining Medicare, Medicaid, and CHAMPVA/TRICARE overpayments from the United States.

85.    Defendants submitted or caused to be submitted false or fraudulent claims to the Medicare, Medicaid, and CHAMPVA/TRICARE programs that by

statute and regulation are due to be returned once the overpayment is discovered within sixty days.

86.    However, Defendants knowingly withheld overpayments by the Medicare, Medicaid, and CHAMPVA/TRICARE programs after identifying these overpayments sixty days earlier, in violation of federal statute and regulation.

87.    Had the United States known that Defendants were retaining overpayments, it would have promptly demanded repayment.  The United States, unaware of the retention of overpayments by Defendants, has been damaged.

88.    Defendants' course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(l)(A); (B); and (G).

89.    Defendants have never refunded such overpayments to the Government and continues to retain such overpayments in violation of 31 U.S.C. §3729(a)(1)(D). Defendants have knowingly and improperly avoided or decreased their obligation to transmit the windfall they have gained to the Government in violation of 31 U.S.C. § 3729(a)(l)(G).

## PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT

*WHEREFORE*, Relator respectfully requests that this Court enter judgment against Defendants, as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud

alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 et seq. provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented to the United States before November 3, 2015; that civil penalties of $21,562.80 be imposed for each and every false claim that Defendants presented to the United States between August 2, 2016 and February 3, 2017; that civil penalties of $21,916 be imposed for each and every false claim that Defendants presented to the United States between February 4, 2017 and January 29, 2018; that civil penalties of $22,363 be imposed for each and every false claim that Defendants presented to the United States after January 29, 2018 as adjusted by the Civil Monetary Penalties Inflation Adjustment, 28 C.F.R. § 85.5, and all future amendments thereto.

(c)     That pre - and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e)     That the Relator be awarded the maximum percentage of any recovery allowed to her pursuant the False Claims Act, 31 U.S.C. § 3730(d)(1) and/or (2); and;

(f)     That this Court award all such other and further legal and equitable relief as it deems proper.

## COUNT FOUR
## MICHIGAN MEDICAID FALSE CLAIM ACT, M.C.L.A 400.603

90.     Relator realleges paragraphs 1-57 of the Complaint as if fully set forth herein.

91.     Upon information and belief, Defendants knowingly made or used false or fraudulent statements, or caused false or fraudulent statements to be used, for the purpose of obtaining and retaining Medicaid overpayments from the State of Michigan.

92.     Had the State of Michigan known that Defendants were retaining overpayments, it would have promptly demanded repayment. The State of Michigan, unaware of the retention of overpayments by Defendants, has been damaged.

93.     By reason of these payments, the State of Michigan has been damaged since at least July 2017, and continue to be damaged in a substantial amount.


## PRAYER FOR RELIEF

*WHEREFORE*, Relator respectfully request that this Court enter judgment against Defendants, as follows:

(a)     That the State of Michigan be awarded damages in the amount of three times the damages sustained by the State because of the false claims and fraud alleged within this Complaint, pursuant to M.C.L.A 400.612(1);

(b)     That civil penalties of $10,000 be imposed for each and every false claim that Defendants presented to Medicaid, pursuant to M.C.L.A. 400.612(1);

(c)     The pre – and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e)     That the Relator be awarded the maximum percentage of any recovery allowed to her pursuant to M.C.L.A. 400.610a; and

(f)     That this Court award such other and further relief as it deems proper.

## **DEMAND FOR JURY TRIAL**

Relator, on behalf of herself, the State of Michigan, and the United States, demands a jury trial on all claims alleged herein.

Dated this the 26th day of March 2020.

By:    /s/ J. Marc Vezina
J. Marc Vezina (P76232)
Texas – 24000141
Louisiana – 24683
Georgia - 465449
**Vezina Law, PLC**
18 S. Broadway, Ste 200
Lake Orion, MI 48362
(248) 558-2700
(248) 232-1581 (fax)
jmv@vezinalaw.com
***Attorneys for Relator***


W. Daniel ("Dee") Miles, III*
Archie I. Grubb, II*
Tyner D. Helms*
**Beasley, Allen, Crow,**
**Methvin, Portis & Miles, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Tel: (334) 269-2343
Fax: (334) 954-7555
dee.miles@beasleyallen.com
archie.grubb@beasleyallen.com
tyner.helms@beasleyallen.com
***Attorneys for Relator***

*Motion for Admission is Pending*